A98A0598, A98A0599. BULL STREET CHURCH OF CHRIST
v. JENSEN et al.; and vice versa.
(504 SE2d 1)

RUFFIN, Judge.

At the Bull Street Church of Christ ("the Church"), ten-year-old Scottie Wileke molested a four-year-old girl. The victim's parents, John Jensen and Monica Jensen Bradley, sued the Church for their daughter's injuries, alleging that the Church negligently failed to protect the victim from Wileke despite having prior notice of Wileke's sexual propensities. A jury awarded the plaintiffs $33,319 in past medical expenses, $25,000 in future medical expenses and $25,000 in general damages. The Church moved for a new trial or judgment notwithstanding the verdict ("j.n.o.v."). The trial court granted the Church's motion for j.n.o.v. as to the award for future medical expenses, reducing the award from $25,000 to $5,000. As to the remainder of the verdict, the trial court denied the motion. In Case No. A98A0598, the Church appealed the denial of its motion, asserting that there was insufficient evidence that the Church had prior knowledge of Wileke's propensities. In Case No. A98A0599, the plaintiffs cross-appealed, claiming that the trial court erred in reducing the award for future medical expenses. For the following reasons, we affirm in part and reverse in part.

In reviewing a trial court's decision on a motion for j.n.o.v., " 'the question before this court is not whether the verdict and the judgment of the trial court was merely authorized, but is whether a contrary judgment was demanded.' [Cits.] A judgment n.o.v. is properly granted only when there can be only one reasonable conclusion as to the proper judgment; if there is any evidentiary basis for the jury's verdict, viewing the evidence most favorably to the party who secured the verdict, it is not error to deny the motion. [Cits.]" *Stone v. Cook*, 190 Ga. App. 11, 12 (1) (378 SE2d 142) (1989).

### Case No. A98A0598

Viewed in the light most favorable to the plaintiffs, the evidence shows that on Sunday, March 10, 1991, the victim attended a class at the church for three-year-old to six-year-old children while her mother, Monica Jensen, attended an adult church service. Jensen left the victim with the teachers of the children's class, Nola and Mark Ledford. Jim Waller, an elder of the Church, testified that the

Church school is a cooperative venture between the Church and the volunteer teachers and that there are no written policies or procedures regarding the operations of the church classes for children.

According to Jensen, the victim usually waited in the classroom for Jensen to retrieve her after church. However, the victim testified that on this occasion the class ended and the children were allowed to leave the classroom to find their parents. While the victim waited for her mother next to a stairwell leading to her classroom, Wileke approached and asked her if she wanted to see his classroom. The victim followed Wileke into an unoccupied room, where he pushed her underneath a table and sat on her legs. Wileke then pulled up the victim's dress, touched her "privates" and kissed her on the mouth. Thereafter, he released the victim and she returned downstairs to find her mother.

After telling her mother what Wileke had done, Jensen contacted the church minister and advised him about the attack. According to Jensen, the minister replied " 'Oh, no, it's happened again.' " Jensen testified that the minister then explained that Wileke had previously acted inappropriately towards a child of another church family. According to Jensen, the elders advised her that they wanted to keep the incident quiet in order to avoid a conflict in the church.

After the attack, the victim received treatment by a psychotherapist, and was hospitalized in 1993 and 1995 after having suicidal thoughts. According to psychiatrist Arnold Negrin whose deposition testimony was presented at trial, he treated the victim during her hospitalization in 1995 when she was severely depressed. Negrin testified that he saw the victim in August 1996, and concluded that while she was not suffering from a major depression, she was still tearful, had no interest in activities, and isolated herself. Negrin stated that the victim would probably need future treatment, either on an out-patient basis or hospitalization. He concluded that Wileke's attack on the victim was a major cause of her depression.

Caroline Watson, a social worker and church member who offered counseling services to other church members on a volunteer basis, testified regarding the church's prior knowledge of Wileke's propensities. Watson said that in 1989, she received a call from church member S.C., who said that she had spoken with Waller about an incident involving Wileke. According to Watson, S.C. said that Waller advised her to speak with Watson about the incident. Watson testified that S.C. told her there were several families from the Church visiting the S.C. household for a "casual get-together." Watson further testified that S.C. said that her four-year-old girl was in the bathtub when Wileke "came in and exposed himself to her and urinated on her." Watson said that she later talked with Waller and another elder, Gary Lyons, about the incident. Although Watson did

not advise Waller or Lyons to warn all members of the church, she did tell Waller that she thought Wileke's behavior was deviant. Watson testified that Waller wanted to keep the 1989 incident quiet. According to Watson, Waller "told me that he felt the less said, the better. . . ."

S.C. also testified, denying that she ever talked with Watson about the incident. S.C. stated that the day after Wileke had been at her house, her daughter told her that Wileke had shown her his penis. According to S.C., neither she nor her daughter ever said that Wileke had urinated on the girl. S.C. testified that her daughter was not emotional about the incident, but viewed it as a "show and tell type thing." S.C. stated that she called Waller for advice since he was a friend and physician. According to S.C., Waller said that if there appeared to be no physical problems, S.C. should just let the incident pass.

Waller testified that as an elder of the Church he listens to the parishioners' personal problems and helps the parishioners when he can. He noted that the elders hold a position of trust and confidence in the Church. Furthermore, he stated that if there was a danger in the Church that was likely to cause harm to children, he would do his best to protect the children. Regarding the 1989 incident at S.C.'s home, Waller denied that anyone advised him that Wileke had urinated on S.C.'s daughter. Waller believed that the incident, as recounted to him by S.C., was benign and merely a type of "show and tell" that should not be overemphasized. He did not think the incident was serious, and he advised S.C. to let the matter drop. There was no evidence that Waller or any church member investigated the incident further. Waller denied speaking with Watson about the 1989 incident shortly after it occurred or advising S.C. to speak with Watson. Rather, Waller testified that after the incident with the plaintiffs' daughter, he spoke with Watson, advising her that her statements concerning the 1989 incident were not true and that she was embellishing the incident to the Church's detriment. Waller also testified that prior to the attack on the victim, he had no evidence of any sexual problems with Wileke. He denied that he attempted to suppress information regarding Wileke's attack on the victim.

Lyons, the other elder whom Watson claimed she spoke with concerning Wileke's encounter with S.C.'s child, denied ever speaking with Watson about the incident. He testified that the first incident involving Wileke of which he was aware was the 1991 assault on the victim in this case.

Another elder of the Church, the minister, and Nola Ledford also testified, denying having any knowledge of the incident at S.C.'s home.

1. As the plaintiffs' claim is one for negligence, they must first

show " 'the existence of a duty; second, the omission to exercise ordinary and reasonable care in connection therewith; and third, injury resulting in consequence thereof.' [Cits.]" *Patillo v. Thompson*, 106 Ga. App. 808, 811-812 (4) (128 SE2d 656) (1962). See also *Tolbert v. Tanner*, 180 Ga. App. 441, 443 (2) (349 SE2d 463) (1986).

In this case, the plaintiffs assert that the Church was negligent in its conduct regarding Wileke and its supervision of the victim. "As a general rule, a person who undertakes the control and supervision of a child, even without compensation, has the duty to use reasonable care to protect the child from injury. Such person is not an insurer of the safety of the child. He is required only to use reasonable care commensurate with the reasonably foreseeable risk of harm." (Citation and punctuation omitted.) *Wallace v. Boys Club of Albany*, 211 Ga. App. 534, 535 (1) (439 SE2d 746) (1993).

As the defendant argued in *Wallace*, the Church in this case asserts that any negligence on its part in supervising the victim was cut off by Wileke's intervening criminal act which the Church maintains was unforeseeable. Id. at 536. However, we concluded in *Wallace* that a specific showing of a prior criminal act on a defendant's premises is not required in a case involving liability for the negligent supervision of a child. Id. Rather, "[w]hat is at issue in a case alleging negligent supervision of a child is whether the danger of the type of harm the child suffered was reasonably foreseeable." Id. And, "what is reasonably foreseeable is not exclusively dependent upon what is known about a specific place. The danger is not only what may happen at a specific place but what may happen to any child at any place, given that children are mobile and may . . . wander away from the place where they are supposed to be if they are not adequately supervised." Id.

Clearly, in this case the Church assumed the responsibility for caring for a class of three-year-old to six-year-old children, including the four-year-old victim. Thus, the Church had the duty to use reasonable care to protect the children from a reasonably foreseeable risk of harm. *Wallace*, supra; *Patillo*, supra. There is also evidence that the Church, through the volunteer Church teachers, breached that duty by allowing the victim and other young children to wander through the Church without adult supervision. *Patillo*, supra. Finally, there is evidence showing that the victim's injuries were caused by Wileke's conduct, i.e., an intervening criminal act. See *Wallace*, supra at 536. See also *Doe v. Howell*, 212 Ga. App. 305 (1) (441 SE2d 767) (1994). Accordingly, the issue is whether there was any evidence that the danger of the sexual assault on the victim was reasonably foreseeable to the Church. *Wallace*, supra at 536.

Pretermitting whether the Church had specific notice of Wileke's sexual propensities, we hold that the Church had reasonable grounds

for apprehending that if the teachers left the victim unsupervised, there was a general risk that the child could be harmed. As we held in *Wallace*, those who agree to supervise small children cannot avoid liability simply because the injury to a child without adult supervision occurred off the premises or because no prior, similar injury to the small child had occurred so as to place the supervisors on notice of the potential for such harm. *Wallace*, supra at 536-537. Instead, care providers must realize that it is foreseeable that a small child, such as the victim, leaving a church classroom could wander off the church premises and be hit by a car, abducted or otherwise injured. Even if the child remained on the premises, the potential for harm exists — e.g., she could fall down stairs, fight with another child, or get into various forms of mischief that would cause injury. Even absent actual knowledge of a specific risk, those who agree to supervise small children are charged with constructive notice of the general risks of harm, including assault and molestation, that may befall an unsupervised child. See *Wallace*, supra. "[A] jury could reasonably find that the [assault] and abuse of young children who are not properly supervised is foreseeable and is one of the dangers parents and other care givers expressly protect children from by providing them proper supervision and care." Id. at 537.

Accordingly, we conclude that the jury in this case had sufficient evidence before it, even without evidence of Wileke's prior behavior, to find that the Church had a duty to supervise the victim, which it breached by allowing the victim to roam free in the Church where it was foreseeable that she could be harmed by a plethora of environmental and societal dangers. See id. As there was an evidentiary basis for the jury's verdict, the trial court properly denied the motion for j.n.o.v. *Stone*, supra.

In addition to the Church's constructive knowledge of the general risks of harm, there was evidence that the Church had actual notice of Wileke's sexual propensities. Thus the Church had reasonable grounds for apprehending that Wileke's criminal act could occur. *Doe*, supra; *Wallace*, supra. Viewed in a light most favorable to the plaintiffs, the evidence showed that Waller, a Church elder who admittedly held a position of trust and confidence in the Church and who had a responsibility to protect the young parishioners, learned from Watson that Wileke has exposed himself and urinated on another young parishioner in 1989. Waller also learned directly from S.C. that Wileke had inappropriately shown her daughter his penis. As well, Jensen testified that after Wileke attacked and abused the victim, the minister proclaimed "Oh, no it's happened again[,]" and explained to Jensen that Wileke had been involved in another sexual incident. While Waller, the minister and other Church elders denied having any knowledge of Wileke's sexual propensities, such conflicts

in the testimony were matters of credibility for the jury to resolve. See *Taylor v. State*, 226 Ga. App. 254, 255 (485 SE2d 830) (1997); *Stubbs v. Harmon*, 226 Ga. App. 631, 632 (1) (487 SE2d 91) (1997). The conflicts in testimony did not mandate a j.n.o.v. See *Stone*, supra.

Accordingly, there was sufficient evidence for a jury to conclude that, at least through Waller's conversations with S.C. and Watson, the Church had notice that Wileke had inappropriately acted in a sexual manner towards a smaller child prior to his attack on the victim. "[W]e cannot rule that [Wileke's] intervening criminal act was unforeseeable as a matter of law." *Wallace*, supra at 536. Accordingly, as stated above, since there was an evidentiary basis for the jury's verdict and a contrary judgment was not demanded, the trial court did not err in denying the Church's motion for j.n.o.v. *Stone*, supra.

2. The Church asserts that Watson's testimony regarding the 1989 incident was the only evidence establishing its prior knowledge, and that because it was impermissible hearsay, it was insufficient to establish knowledge.

We first note that there was other evidence showing the Church's prior knowledge of Wileke's actions in 1989, including S.C.'s discussion with Waller about the incident and the minister's reaction when Jensen told him about Wileke's attack on the victim. And, in any event, we find that Watson's testimony regarding what S.C. told her about the 1989 incident was not impermissible hearsay.

" 'As a fundamental rule, the definition of hearsay does not include out-of-court statements which are not offered as proof of the facts asserted in such statement, but are offered merely as proof that such a statement was made.' Green, Ga. Law of Evidence (4th ed.) Hearsay, § 218." *Quiktrip Corp. v. Childs*, 220 Ga. App. 463, 466 (3) (469 SE2d 763) (1996). Moreover, "[w]hen, in a legal investigation, information [and] conversations . . . are facts to explain conduct and ascertain motives, they shall be admitted in evidence not as hearsay but as original evidence." OCGA § 24-3-2.

In *Quiktrip*, the trial court admitted testimony regarding what unidentified persons told Quiktrip employees about an icy condition on Quiktrip's premises that subsequently caused the plaintiff's injuries. We held that "the issue was not whether the unidentified individuals were telling the truth when they informed the Quiktrip employees about the ice, but rather, whether Quiktrip had notice of the hazardous condition. Thus, this testimony would be 'direct evidence of the fact in issue: Quiktrip's notice of the hazard.' [Cit.]" (Punctuation omitted.) Id.

In much the same fashion, Watson's testimony regarding S.C.'s statements to her was direct evidence because it explained what inspired Watson to notify the elders of Wileke's propensities. Watson's testimony about her conversation with Waller and another

elder provided evidence that the Church had notice of the hazard. The circumstances as to how Watson learned of Wileke's prior behavior were pertinent to her testimony and the credence given to what she told the elders. S.C.'s statements were not admitted to prove the truth of those statements. Rather, Watson testified regarding the statements to show that the statements were made and that these statements precipitated her decision to speak with the Church elders about Wileke's behavior. See *Quiktrip*, supra.

Moreover, Watson's conversation with S.C. explained Watson's conduct and motive in advising the Church elders of Wileke's propensities. See OCGA § 24-3-2. And this conduct was pertinent to show that the Church had notice of Wileke's actions. See *Bryant v. Carver State Bank*, 207 Ga. App. 659, 660 (1) (428 SE2d 621) (1993) ("[B]efore such hearsay evidence becomes admissible for the purpose of showing conduct, that conduct must be a relevant issue in the case. [Cit.]"). Accordingly, the trial court did not err in allowing Watson to testify regarding her conversation with S.C.

### *Case No. A98A0599*

3. In their cross-appeal, the plaintiffs assert that the trial court erred in granting the Church's motion for j.n.o.v. regarding future medical expenses and unilaterally reducing the verdict. We agree.

An award of future medical expenses is authorized where it is supported by competent evidence "to guide the jury in arriving at a reasonable value for such expenses." *Ga. Power Co. v. Watts*, 56 Ga. App. 322, 324 (4) (192 SE 493) (1937) (physical precedent only).

In the instant case, the plaintiffs presented evidence that in the five years between the attack and the trial, the victim's medical bills totalled $33,319.55. The victim had to be hospitalized twice, in 1993 and 1995, for depression. In 1995, the victim began to hear voices and had suicidal thoughts, requiring her hospitalization. In 1995, Dr. Negrin treated the victim and concluded that she was severely depressed. During his deposition testimony presented during trial, he linked the victim's depression to Wileke's assault.

Negrin testified regarding the victim's future medical expenses. While he noted that she did not appear to suffer from severe depression in 1996, he said that she still had nightmares, difficulty sleeping, unexplained crying episodes, and isolated herself. Given the recurring nature of depression, Negrin testified that the victim would benefit from active treatment with a child psychiatrist through 1997. He further asserted that the victim will probably need some form of treatment in 1998. According to Negrin, this might include therapy on an out-patient basis, or may require hospitalization. Negrin noted that his rate for therapy was $120 an hour and

that anti-depressant medication costs between $60 and $80 per month. Negrin concluded that given the nature of the victim's depression, she may need treatment for 20 years or treatment in 20 years if the depression recurs.

While the plaintiffs' evidence does not pinpoint a specific figure for future medical costs, we find that the jury's award of damages was within the range of the evidence and thus must be affirmed. See *White v. Arthur Enterprises*, 219 Ga. App. 124 (1) (464 SE2d 225) (1995); *City Dodge v. Gardner*, 130 Ga. App. 502, 505 (3) (203 SE2d 729) (1973) (physical precedent only). Moreover, as the evidence did not clearly demand a reduction of future medical costs to $5,000, we conclude that the trial court erred in· granting the Church's motion for j.n.o.v. on this issue and reducing the award. *Stone*, supra.

*Judgment affirmed in part and reversed in part. Pope, P. J., and Beasley, J., concur.*

DECIDED JUNE 16, 1998 —
RECONSIDERATION DENIED JUNE 26, 1998 — ▮▮▮▮▮▮

*Barrow, Sims, Morrow, Lee & Gardner, R. Stephen Sims, A. Mark Lee, Goodman, McGuffey, Aust & Lindsey, Edward H. Lindsey, Jr., Elizabeth B. Thompson*, for appellant.

*Savage, Herndon & Turner, Robert B. Turner, Robert S. Kraeuter, Russell M. Stookey*, for appellees.